On behalf of the Aperon, Ms. Janie L. Montgomery, on behalf of the athlete, Ms. Erin T. Piscitelli. Is that the other way around? Yes, and we don't have any little... Okay, let's... I'm sorry. It would be... Erin Piscitelli is for the Aperon. Right. Okay. Would you step forward, please? Thank you. Good afternoon, counsel. Good afternoon. May it please the court. The issue in this case is whether the trial court erred in suppressing the defendant's statements that were made subsequent to his invoking his rights. Now, to determine whether this was correct, we must determine whether he re-initiated contact after invoking his rights, and then secondly, whether he voluntarily waived those rights. Now, in reviewing the court's motion to suppress or suppression of the evidence, we have to give great deference to the trial court's factual findings. But the ultimate decision on whether those statements should have been suppressed is reviewed de novo. We have a unique problem here. The trial court made very few factual findings that were relevant to this issue. Now, as for a first determining whether defendant re-initiated contact with the police, the court seemed to completely ignore this requirement in its order. Well, counsel, wouldn't the court's finding really have to be implied because it went on with the analysis? Yes, Your Honor. In my reply brief, that's what I imply. I imply that, yes, in fact, the trial court did say, okay, there must have been re-initiation of contact. Otherwise, how would it even get to the voluntariness issue at all? It could have just simply said he did not re-initiate contact on June 25th or June 26th. Therefore, we're done. And that would be my precise argument. If, however, we want to think maybe the court didn't quite get it right or wasn't clear and just simply left out that factual finding, well, there's no factual finding to be given deference. So if this court were to look at the record, the record also clearly supports the trial court finding that defendant did re-initiate contact. And how does that record reflect that? How does the record reflect that? Well, on June 25th, when defendant asked to holler, as it is in the record, at Detective Capilouti, I believe I'm saying that right, Capilouti, he's asked if he could holler at him. Now, the defendant, of course, says on the stand in testifying to the motion expressed, well, I didn't do that. And he says I was lying on tape when I said yes, I did want to talk to him. But we can't really give much credibility to defendant's statements because he admits when he testifies that he's willing to lie to help himself. Did he want to talk to him about the mother, though? Maybe I misunderstood. I'm sorry, what? When he said he wanted to talk to him, did he say he specifically wanted to talk to him about things without his attorney, about the alleged offense? I got the impression that he was talking to him about a cigarette and his mother. A cigarette, he did speak about a cigarette at one point. He did ask to have a cigarette. It's unclear, though, from the record that that was the purpose that he was there or that we can really imply that that was the reason he was in this room with the detective. I mean, there's conflicting testimony between the detective and the defendant, of course. But the tape does imply that he asked specifically, well, have you talked to my mom yet? And that's what he talked to. And even if you don't want to say that that was a generalized intent to discuss it, then if you watch the tape carefully, the defendant goes on to make some inaudible statement. And it's really hard. I can't tell what he's saying, and I don't know if you'll be able to or not. But it lists the response from the detective saying, well, the difference is, and then an inaudible response, and you will put yourself in the car talking about the incident, about the shooting. So if the defendant made the statement that resulted in that answer, I think that more combined with did you talk to my mom, implying that did you tell her about this investigation because she was there when I was taken away, if you combine all of this and the fact that the defendant goes on to keep talking to him, he's well aware of his rights, he's reinitiating this conversation. He's been involved with it. I think he said he was well aware of his rights. Was he admonished and given Miranda warnings before he started talking again? Was it the Miranda? No. Was the right to an attorney even discussed by Capitelli? I mean, you talk about he has a desire to talk, but I don't see anything in the record that indicates that he was admonished that if he was going to talk, he was going to be talking about things that would result in a waiver of his attorney and would result or be concerned with things incriminating. What's one thing to discuss? Six nuggets and some French fries, cigarette, can of soda, and whether or not you murdered somebody. Could you give me something more specific when it comes to an actual enunciation in the record that when the detective said, do you want to talk to me? It was understood and translated or related by the detective that he was talking about things regarding the investigation and not whether or not his mother tried to contact him. Well, the statement about the mother came after quite a bit after that. The defendant asked, do you want to be in this room? Do you want me here? So I think we're kind of dealing with two separate things. And you asked about the Miranda rights. Well, he wasn't specifically re-read his complete rights then, but that morning he was given his rights by another detective. He invoked them. And Detective Capilouti says that he reminded him of that and he did want to talk. This was the testimony that he did want to talk still. So, no, I can't give you anything specific where he says, yes, I want to confess and I want to talk about this investigation. But I think it's a very rare case that you will find that. And I do think that he was completely aware of his rights. He does not need to be given fresh Miranda rights before every statement. That's simply not the law. He needs to be aware of his rights. And I think the record is abundantly clear that this defendant was aware of his rights and he continued to talk. Now, had the circumstances changed, however, which would have required him to be re-advised of his rights? Well, that's – defendant claims, yes, they did. But I think the record is pretty clear that, no, they did not. Defendant claims that he was beaten up. But as the trial court found, he didn't think there was enough evidence. The trial court simply stated there was conflicting testimony and didn't make a finding as to this. I mean, that seems to be pretty clear that the court doubted defendant's credibility as to this. The pictures, when you look, I don't see any evidence. Why do you say the court doubted it? Well, the court said – The court said both, but the court also – So it doubts the states and it doubts the defendant's statement. He said that he – there was definitely testimony that the defendant injured himself. That was agreed by everyone. And then he says there was some conflicting testimony that defendant claimed he was abused. Okay, but then also in the record you'll see that the trial court, excuse me, said, I do believe that some of the things testified to on direct examination had to have happened or we wouldn't have talked about him, so to speak. But then he says I seriously doubt whether some of those things on cross-examination were true. And among many things was the abuse talked about on cross-examination. So I think the fact that the trial court wasn't willing to make a finding, this is a pretty big finding, and all he was going to do was repeat that, oh, yeah, there was mention of that, that seems pretty doubtful to me that he gave any credibility to those, especially when you look at the pictures, you look at how he was interacting. I mean, he hugged this detective after the final interview, after he confessed. He hugged him. He didn't have resentment against him. You'd think he'd have resentment if this guy watched him get beaten up by these other detectives. All right. Ned, aside for a minute, don't you think the self-mutilation was enough to show the defendant's changed state of mind? I think it might go towards state of mind change, but I don't think that bears any burden on the cops having to re-emerandize him. Yes, he thought about it, the length of detention. Yes, he sat there and he thought about it and he thought I just murdered somebody. I'm in serious trouble here. I've never been in this situation yet, and hurting myself sounds pretty good. I don't know what I'm going to do. He also carved things on his cell about the people who told on him, so to speak, and ratted him out to the police, and he was upset. He was very upset. He felt helpless, as would anyone who was facing life in prison. Doesn't that cast doubt, that situation cast doubt on the voluntariness of his waiver of his Miranda rights? I don't believe they do. I believe that they just are showing that he was aware of his situation. I don't believe that makes it any more involuntary at all. Am I correct in thinking that he was told that his family basically had abandoned him, or at least when he made a request for information, he was given either no information or were told that they didn't attempt to contact him? He was not told that I can remember anywhere in the record that the family abandoned him. You said that they either laughed or gave no response whatsoever. What did the police say? I'm sorry. In the record, are you saying what did the police say when the defendant asked that? In the record, yes. Okay. Well, the defendant testified that, yes, they laughed or had silence. There's no evidence in the record, like the videotapes, that that happened, and detectives obviously testified that that was not true. However, one point in the tapes, the defendant does mention his mother. Did they come looking for him or come to the police station or anything? And if I remember correctly, Detective Capilouthi answered no. But there's also nothing in the evidence that shows that he was in there with him that he would have known had they come to the front of the police station and someone misinformed them and said, oh, he's not here, unaware of who all they had. I mean, this was a big ongoing investigation. Yes, that might be a miscommunication, but I think it doesn't go towards excluding these statements. I mean, this should be a limited function to exclude statements such as this. And why that's unfortunate, yes, but his family obviously knew where he was. They were there when he was taken away. They know where he was when they attempted to contact him at least, I believe, three times. One in the police department, second time in the sheriff's department, and the third time back in the police department. And I think the third time the mother was directed to go to a fourth place. She went there. I don't know where that was, but it was supposedly another building. That coupled with the statement that the defendant didn't need a lawyer, the fact that the defendant testified that he tried to make contact with his family, and the fact that he was kept essentially incommunicado for 48, 50-some hours, how does that relate to whether or not he was placed in a state of mind where he was resigned that the only way he'd get out or see the light would be to talk with the police? Because I believe somewhere he said, the only way I'm getting out of here is if I talk to the police. Did he not say that? Did he not say if only I could get out of here? Did he not testify to that? Oh, yes, he testified that he believed the only way he was getting out, which is convenient for him to say after the fact when he's trying to prove that it was involuntary. However, I'm going to try to take apart a little bit of your question piece by piece. I'm sorry. Go ahead. The family were told different things according to their testimonies, and some of their testimonies don't quite fit together. It's hard to tell whether all these trips to the police station really occurred. However, the trial court did find that he did believe that they were told, misinformed of where he was. But there is no doubt they knew he was in custody. They were there when he was taken away. They knew he was in custody. As for the fact that this was involuntary because he was just so oppressed by the police and excluded from everyone he knows, that's the interrogation. That's the essence of interrogation is that you don't have free will to just contact whoever you want. This was not a minor we were dealing with. He had no right to have a parent in the room with him or his family or his friends. He had the right to have reasonable contact with them at a time prescribed. The ongoing investigation was going on, and at some time they were going to let him contact his family, which they did. Which they did when? I'm sorry? You said, and they allowed him to contact his family? After all of this. I see. So had he not confessed, theoretically, using your line of logic, they still wouldn't have allowed him to talk to you. I don't think that it's fair to assume anything there. I have no idea what would have happened had he not confessed. He could have been locked back up. When did the police focus their investigation on the defendant as the murderer? I believe it was late hours of the 22nd to the early hours of the 23rd. The times are somewhat up in the air, but they had information that he was, in fact, the shooter. They took him in. There's no argument at all by defendant below at the trial court level that he was unfairly detained. The question here isn't when did he invoke his rights or if he did. It is clear he did. Whether it was at his house, whether it was at the police station, he did. The key to understanding this case, though, is whether he reinitiated, which he did, and whether he voluntarily waived those rights. And I think what's abundantly clear here is that he knew his rights. It would have been reasonable for them to take him before a court to set bond, having determined that he was, in fact, the prime suspect or was going to be charged. When would it have been to go to bond court or something? I think that part of the ruling implicit in the court's judgment was that he felt that this man was being held, essentially, until he was going to talk. Because one of the statements I remember was something to the effect that the reason why he wasn't taken to a bond court was because they supposedly were going to have further confrontations or communications with him, which I found intriguing because he had indicated that he didn't wish to talk to them except with an attorney.  It would appear that they were going to merely keep him incommunicado until such time as he relented because they weren't, according to their own statement or policy, going to take him before a bond court until such time as he talked. Well, I don't think we can sit here and make presumptions on what could have or would have happened. I'm not making a presumption. I'm suggesting a logical line of conclusory thought. What's unreasonable about the suppositions or the conclusions that I'm coming to based upon what I've just related? Well, I guess what I'm saying is that he was taken in custody, he was held in custody. The detectives testified that the ongoing investigation was going on and they kept him in that cell. They didn't bother him questioning him if he in fact invoked his rights, which there's different steps along the way where he claims he did, the detectives claim something else. But if he had invoked his rights and they put him in that cell and they were collecting information, they said that they were still just collecting information. It's an ongoing investigation. Now, he reinitiated contact approximately somewhere around 48 hours after being in there. Now, yes, 48 hours is the general let's make sure they're taking him before a judge, but it's not set in stone. And they were gathering facts so that they could inform the court exactly what happened. I mean, there was more than just what defendant was going to say or not say, especially since he wasn't saying anything, even though they knew, okay, he's the shooter, people are telling him he's the shooter. They wanted to gather as much information as they could before they went in front of the court, which I think is completely reasonable. That isn't what one of the officers testified to. He said the reason why he wasn't taken by court was because they wanted to talk to him. Well, I'm not sure which detective you're referring to, but the sergeant in command said that it was an ongoing investigation. Sergeant Beach testified that it was an ongoing investigation. And were they interviewing others? They were interviewing others, exactly, like I believe a randle that was brought in. And maybe one detective did testify and say, yes, we were going to question him further. I don't think that's enough to find that he was being held, that one detective may have said this. He may have been misinformed, too. He may not have known that his rights were invoked yet. He may be just dealing with another part of the investigation at the time. Who knows? I don't think there's concrete enough evidence in the record to know that that is what happened. That's the problem here, I think. You are aware of the law that says that if a trial court doesn't make findings of fact, that we are to presume any issue of fact to have been found in favor of the appellee on appeal? Yes, I am. Should I save the rest for rebuttal? Right, if you want to save the rest for rebuttal. All right, Ms. Montgomery? Good afternoon, Your Honors. Good afternoon. May it please the court, counsel. My name is Jamie Montgomery. I represent Ricardo Cruz, the defendant appellee. Can you keep your voice up, please? Yes, ma'am. You've got to adjust the microphone. Is that better or worse? Up a little bit further. There you go. That's better. Okay. Thank you. This case is exactly the situation our laws were intended to prevent. As Justice McLaren noted, it does seem that Ricardo Cruz was kept in custody, incommunicado, until he broke down and confessed. He was kept in what the police describe as, what even the state's witnesses, police officers describe as the coldest cell in the entire police station. No, it was the coldest room, not the coldest cell. Coldest room. Well, starting right there, counsel. He was fully clothed, was he not? He was in a short-sleeved shirt. Pardon? He was in shorts and a T-shirt. Shorts, meaning denim blue jean shorts that were down to his ankles, as well as a regular cotton T-shirt. Isn't that correct? And he had a blanket, at least one blanket to begin with. Isn't that correct? He had one blanket to begin with. He did testify that he was still cold. In fact, one of the reasons he asked to be taken out, one of the reasons he was, when he was brought into the interview room on tape, he says he's cold, yeah, and kept what he gives him. Now, it was summertime, was it not? It wasn't the dead of winter. Correct. Isn't that correct? Was there any testimony that anyone observed him to be physically shivery? No. Were the denim pants a paper suit? I mean, I believe he was wearing a paper suicide suit. Once the self-inflicted injuries were discovered, he was put on suicide watch and his clothes were taken away and he was put in a paper suit, which made him even colder. And he had additional blankets at that point, did he not? He had additional blankets. He also testified that he was still cold, even with the additional blankets. And we can't forget that even the police admitted that this was the coldest room in the police station. The state has never contested it. But we don't know what temperature it was, counsel, do we? We don't. But the fact that the police didn't question him when he asked for two additional blankets lent some, you know. I'm sorry. The fact that they didn't question him? When he asked for additional blankets. But you mean they didn't say no or refuse them, is that what you're saying? That implies that the police officers understood that it was pretty cold in that room, especially once he's in a paper suit. Now, the state has spent a lot of time discussing whether or not the defendant re-initiated contact with the police. And I think it's important to recognize that there is no finding by the court below whether or not the defendant re-initiated. I don't think this court has to assume that the defendant, that the court found implicitly that the defendant had re-initiated or that he had re-initiated. Well, what was the trial court doing when it went on with its analysis then? There's two discrete analyses in a situation like this. The court has to determine whether or not the statement was voluntary. And also, if the defendant has previously invoked his rights to counsel and to silence, then whether or not the defendant re-initiated. And then go on to determine whether or not the waiver was knowing and intelligent. Now, regardless of whether or not the court finds the defendant re-initiated contact, the court's ultimate finding that the statement was involuntary trumps everything. Even if the court below did find that he re-initiated contact, the court's finding that the statement was involuntary trumps that analysis completely. Well, if this has been over-reviewed, why wouldn't we be reviewing whether or not he did or did not initiate? Well, that's why I covered re-initiation in my brief. I'm just pointing out the fact that, you know, we don't have to assume what the court did below. This court can also find that the statement was involuntary for all the reasons that have been brought up, such as the length of the time that he was in custody, the incommunicado interrogation, the fact that the police essentially thwarted the family's every attempt to get contact to him to get a police officer to give him a lawyer's report. Well, how is that relevant, the fact that the police may have done that? Is that a factor that the courts? Absolutely. And what authority do you rest on for that? The Westmoreland case that I cited. And how are the facts of Westmoreland like the facts of this case? Well, the defendant in Westmoreland was also an adult. Granted, he was younger than Ricardo. Ricardo was 21 years old. However, in Westmoreland, this court found that there is a basis at common law, and certainly within the totality of the circumstances analysis, to discuss whether or not a family is completely, you know, if a family is kept from the person who's in custody. And it also applies here. The police, the attempts to keep his family from him certainly is. Well, he didn't know that. The defendant didn't know that. No, he did know that he had asked his mother as he was being taken out of his mother's home. To get a lawyer. Isn't that right? That's a different issue than the one you're discussing. Those are two different issues. Are they not? I don't think they're necessarily two separate, entirely separate issues. I think they're interrelated here. Because on the one hand, we have Ricardo sitting at the police station for four days, knowing that he'd asked his mother to get him a lawyer, and knowing that he had lawyers in the past. And he's waiting and waiting and waiting for a lawyer to show up. And no one ever shows up. And he's not, anytime he asks to make a phone call, the police tell him that he can't make a phone call. He asks about whether or not his mother has contacted the police and is told that she hadn't, when in fact she had. Now, whether or not Capilouti knew that for certain or not is unclear. We don't have testimony on that. However, we do have on the videotape, we have Capilouti telling Ricardo that his family has not contacted him, but PR, who's one of the other suspects in the case, that his family had called for him and that PR's dad and sister had come to see him. Now, Capilouti then tells him, no one has come for you. No one has come for you. That's on the videotape. That's clearly an indication that Capilouti knew that the defendant was waiting for a lawyer to come or for some sort of indication that his family had not abandoned him there in the police station for four days. Okay, but now we're talking about somebody who's 21, who had at least been questioned by the police on ten prior occasions, and who was streetwise. Is that not correct? That's correct, Your Honor. And so that's a different fact situation than the Westmoreland case. It is. There was no prior record on the part of the defendant in Westmoreland. Correct. However, Westmoreland stands for the notion that this court can look at whether or not a concerned adult was thwarted from having any contact with the family or with the defendant, and that it's part of the voluntariness and goes into the discussion of whether or not it's coerced. So you should imply that the defendant knew that. I think in this case it's clear that the defendant knew that his family, that he knew he had asked his mother for a lawyer. I don't think that it's clear that he knew the police had been lying to his family and telling them that he wasn't there. And I also think it's pretty atrocious in this case that one of the police officers told his family that even if they had gotten him a lawyer, that the lawyer would have no contact with him in the police station. Did you not put in your brief something about a statutory right that sets forth the right to contact a lawyer and a member of the family? I did, Your Honor. And I do put that in there. It's in the brief for the fact that, you know, we had never argued that he was a minor, that he has any protections under the Juvenile Court Act, as the state has seemed to argue in their reply brief. We've never asserted that. We've always asserted that he had a right to contact his family or a lawyer. You know, in this case, the right to contact his family in order to get a lawyer, not to have some casual let's sit around and talk about what's going on meeting with his family, but in order to get counsel. And that's during the course of the police investigation of this murder. Is that what you're saying? Yes. There is a statutory right to have within, I believe it's a reasonable period of time. And who determines the reasonableness? I'm sure the police officers. I don't know that they're there. Actually, I don't believe there's any case law on that particular statute. But here we have a defendant who was kept in a cold cell. He's kept for days on end. Every time he asked for, he asked for a lawyer repeatedly and was either met with silence or laughter by the police officers. There's, at best, the record shows that he was fed maybe two or three times in the time that he was in custody. Well, it also reflects that he said at one point that he couldn't eat. He didn't feel like eating. Isn't that correct? That's correct. But that doesn't necessarily mean that he didn't need nourishment. All right. But that isn't a factor that the courts have looked to. Isn't that correct also in determining voluntariness? They've looked at whether or not, I mean, there's the physical condition. And whether or not you've eaten in days is part of your physical condition. Now, we admitted in our brief that there is no nutritional requirement simply for the fact that we're not saying it was wrong for the police to give him Chicken McNuggets and French fries. That's not our argument. Our argument, we're not arguing that he wasn't given, you know, nutritional meals that were wholesome and full of vitamins. We're just saying he was not fed very much in the time that he was in custody, and that was part of his physical condition. Now, during the videotaping, when a police officer asked if Ricardo wanted to talk, did the videotape indicate or relate that there was a specific waiver or a question relating to the waiver of an attorney such that any affirmative or negative response would have been an appropriate answer? Absolutely not. In the discussions that were had on the videotape, in the first discussion on the 25th, I believe that's the discussion where the testimony was that the defendant asked to holler at Capilouti about the cigarette. In that case, the state has argued in their reply brief that there was some inaudible statement by the defendant that caused the police officer, or the detective, to respond in a way that shows that he had reinitiated discussions. But at that point, Capilouti did not do anything to remind the defendant that he had invoked his rights previously, which… Well, doesn't the record reflect that he did actually remind him that he had earlier said, that the defendant had earlier said he didn't want to talk to him? That he had told Schlitz that he didn't want to talk? That Capilouti reminded the defendant? Yes. Capilouti told him that he was only there to give him a cigarette, but he will talk if the defendant wants to talk. There's no, at least in my notes, there's no reminding here that he had previously invoked his rights and that if you want to talk about the case, we'll talk about the case, but remember, you asked for a lawyer. There's nothing like that in the tape. Sorry, just to spell the name of the question. Isn't the, what Capilouti said, you know, talk if you want to talk, isn't that indicative of a desire or a need to the defendant that he should talk? That the defendant should talk about the case? Once you exercise your rights, there should be no contact of any kind with the defendant that would in any way encourage him or make him think that he wants to, the defendant should restart the conversation or a conversation with the police. Correct. Under Oliveira, there should be no, the police officer should not engage in any conversation that is likely to elicit an inculpatory response from the defendant. Doesn't the state have the burden, once the defendant exercises the right to silence, the state has the burden of proving that he waived that right? Absolutely. And isn't Capilouti's statement, even in the interview room, to the effect that he, Capilouti could not enter the room unless the defendant gave him permission, when number one being an untrue statement, there was nothing barring Capilouti from coming in. And by using the word permission, it's the word that's sort of in sight of engaging in a conversation, starting to engage in a conversation is one way to look at it. In other words, there's no doubt that the police have various techniques to encourage a defendant to commence conversations. Absolutely. Throughout the interrogation on the 25th, Capilouti repeatedly engaged in several tactics used to lure Ricardo into confessing. He suggested that maybe there was an accident. He suggested that Ricardo was the victim here. Many of the things that, and told him he should confess his sins, and that if you told him what happened, he could tell Ricardo's mother and tell the court what he testified to. And he also, you know, at one point, Capilouti implied that, not just implied, said that he was friends with state's attorneys and went to judges' children's birthday parties and, you know, implied that he would be able to get some sort of leniency for Ricardo if he confessed to him. And, you know, this was all without any sort of reminder that he had been, that he had previously waived. Was it ever conveyed to the defendant what we hopefully appear to know here, and that is that it's an all or nothing issue and that when you say, do you want to talk, it means read between the lines and you are waiving your right against self-incrimination. You're waiving your right to counsel, which you've been announcing for the last two days or so. Is there anything in the record that indicated that the officer told him that when I say, if you want to talk, I can only talk if you waive your right to an attorney? No, he never said that to Ricardo at all. Is there anything in the record that would supposedly give this defendant the experience to know what we're talking about right now? You know, it is true that Ricardo had previous experience with being questioned by the police. I believe he testified that he had been in custody ten times previous. Do we know whether or not he previously stood on his Fifth Amendment rights against self-incrimination and sought a lawyer? No, all we know is that he had previously been involved with, he had previously been in custody at least ten times and that he had previously had a lawyer that his family had hired for him, but we do not know if he'd ever asserted his rights before or if he'd ever confessed before. None of that is on the record. But we do know he'd been registered for anti-rights. We do. Okay. We also know that in this situation, he knew he was in over his head and he needed a lawyer. And that's why he repeatedly asked for a lawyer despite the state's, despite the police silence and laughter. For all these reasons and those in the defendant-applicant's brief, we'd ask that this court affirm the findings of the trial court. Thank you. Ms. Piscitelli. Thank you. Real quick on the last question, I'd like to point out that Detective Michael Reed did testify during the motion to suppress regarding an interview he had with the defendant in 2004 on an unrelated shooting case where he had gone through his marine rights with the defendant. He had the waiver form in court. It was People's Exhibit 15 through 17, I guess, that was presented. And he handwrote a statement, signed a statement, and waived his rights. So he was aware of how to waive his rights, what would happen. He'd been through this somewhat before. But I think also the defendant, or the defense counsel, I guess, really stresses the cold cell. And I'd like to just point out, too, that the record is not clear that he spent a whole lot of time in that cold cell because according to the defendant, he was pulled out into these interview rooms over and over again, much more than the record really indicates according to the detectives and the tapes. So I guess I'm saying he can't have it both ways. Either he was in the cold cell or he was being pulled out and interrogated much more than he claims. I just see a little credibility doubt there because it's one thing or the other, and it seems like he's trying to play both sides. Now, and it's true, we don't know the temperature. Now, as far as getting to the involuntary issue, yes, it would trump whether or not he reinitiated contact. But I think the court did find that he did reinitiate it because I don't think he would have even had to get to the involuntariness test if he hadn't found that. And I don't know why he would waste the time doing that. Now, I think it's really important, though. This is an overview, is it not, so we can't address whether or not you've established or showing by the Congress that the defendant, in fact, initiated further discussion relating to communications regarding a crime as opposed to a cigarette or his mother or the cold in the cell or chicken nuggets or his scratches with a can of soda powder. Well, I think it's absolutely true that you can make any findings relevant to what the issue is in this case. And on that point, I'd really like to get to what happened on June 26th. And I think that shows even more how aware the defendant was of his rights and that he waived his rights. He specifically asked to talk to the detective when the detective wasn't even on duty. It went through a couple other police officers to get the message back to him when he came on duty. Commander Stevenson testified. He said he was given this message that the defendant wanted to talk to Detective Capilouti, and he transferred it on. Everyone was aware. The detective then came and asked the defendant, hey, did you want to talk to me? Yeah, okay. You sure? Yeah. He hadn't eaten. So he mentions in the videotape, okay, you said you were hungry, so I got you this meal. Well, he's just showing that it was voluntary, that this guy had been fed. I mean, that he hadn't been going two days since he had been refusing food, that he hadn't been going that long before he confessed. I don't think there's any indication that that's the sole reason they were in that room, especially when the detective says, okay, I'm going to read you your rights again and read them as rights again. And then the defendant confesses. Just out of curiosity, what do they need his confession for if they've got all these witnesses that eyeball the defendant? Your Honor, I actually made a call to the state's attorney right before this argument to just ask, okay, so how much pressure is on me here? And he said, well, you know, we do, we have other statements. But they all are in a situation a lot like the defendant also. I mean, they don't have the best track record. So as a state's attorney, what are you going to go for? You're going to go for the confession also. As long as it's voluntary and as long as it's admissible, why not get it in there? And the fact is, the defendant did confess. He did. So why shouldn't it be used against him? And, Your Honors, I don't know if you have any other questions, but I'd just really like to stress the fact that that June 26th statement, he knew his rights. He understood what was going on, and he confessed. I don't think it's fair for him to play the system and claim that he didn't know his rights or his family wasn't allowed to see him, he's not a minor. I don't think we have a case like that. I don't think he was kept from the outside world just to get a confession. I think the cops were doing an investigation on a shooting that was gang-related to try to find out exactly what happened and go forth with the most evidence that they could present. Do you recall if the defendant had denim blue jeans on by any chance? Shorts, denim shorts. Denim shorts? And a t-shirt, I remember from the video, yeah, and tennis shoes. And I've never worn a paper suit before. Can you tell me? Is it like a heavy paper towel? Your Honor, I've never seen it or worn it either, so I can't tell you for sure. But it was kind of hard to tell in the video, too, because he had a blanket wrapped around him during that part on the second interview on the last day on June 26th, so it's kind of hard to tell, but he had the blankets. And, you know, he tried to injure himself, to kill himself. I don't think it's fair to use the fact that he was in a paper suit against the state. I mean, he did that to himself. Are you talking about paper cuts now or cuts from the can? The can or the concrete piece that he said, but, you know, yes, not paper cuts. I don't think he ever claimed there were paper cuts that I remember in the record. Are there any further questions, though, that I can answer for you at all? No. Thank you very much, counsel. The case would respectfully request that you reverse the trial court's order. Thank you. Thank you, counsel. At this time, the court will take the matter under advisement.